**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF**
**ARKANSAS**

---

**STATE AUTO PROPERTY**
**AND CASUALTY**
**INSURANCE CO.,**

**Plaintiff/Counter Defendant**

**VS.**          **Case No.: 5:21-cv-05063-TLB**

**HUBAR, INC.**

**Defendant/Counter Plaintiff**

---

**HUBAR, INC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR,**
**ALTERNATIVELY, MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant/Counter-Plaintiff Hubar, Inc. ("Hubar") hereby moves this Court, pursuant to

Fed. R. Civ. P. 56, for summary judgment or, alternatively, partial summary judgment against

Plaintiff/Counter-Defendant State Auto Property and Casualty Insurance Co. ("State Auto") on its

claims for declaratory judgment and breach of contract. In support thereof, Hubar states:

**I.      INTRODUCTION**

State Auto filed the current lawsuit against Hubar for no other reason than to try and avoid

coverage on an otherwise valid claim resulting from tornado loss under several coverage parts on

an insurance policy State Auto issued to Hubar. It is understandable why State Auto wants to avoid

coverage: Hubar took out a policy in early March 2019, paid less than $10,000 in premiums for

the policy, and then experienced tornado damage that resulted in Hubar submitting a claim to State

Auto for over $1,000,000.00. However, simply because State Auto is taking a loss on the policy it

issued to Hubar is not a sufficient reason to deny a claim. And as set forth herein, there is no other

colorable basis supporting State Auto's attempt to avoid coverage.

To be clear, State Auto acknowledges that a covered tornado loss occurred causing significant damage to Hubar's property. State Auto actually paid Hubar the policy limits (over one million dollars) for Hubar's property damage claim under the insurance policy. What has brought Hubar's insurance policy with State Auto before the Court is coverage for Hubar's business income loss ("BIL"), one of the other coverages Hubar has with State Auto (there were four such coverages).

Following the tornado, in addition to submitting a claim for property damage, Hubar submitted a claim for BIL. State Auto denied the claim, alleging that, during the BIL claim process, Hubar knowingly made a misrepresentation of material fact regarding the existence of a written lease agreement Hubar had with Central Arkansas Recycling and Disposal Services, LLC ("CARDS"), and/or its subsidiary company, Trashmann (collectively, "CARDS").

As relevant to this issue, <u>no one with actual knowledge of the matter disputes that Hubar and CARDS had an oral lease agreement</u>. This oral lease agreement was reduced to writing by Hubar and CARDS after the tornado and submitted to State Auto, who had falsely told Hubar that it needed the lease agreement in writing in order to provide coverage (this was a blatant misrepresentation of the Policy's terms by State Auto, as the policy does not require a written agreement). <u>The written agreement was dated to reflect the actual date of the oral agreement between Hubar and CARDS</u>. State Auto contends that Hubar's conduct of creating and dating the written agreement to reflect the date of the oral agreement constitutes a misrepresentation of material fact regarding the lease agreement, which, pursuant to the Policy's terms, would void any coverage under the Policy and allow State Auto to recover from Hubar the insurance payments State Auto has already made (for the property damage).

For the reasons set forth hereinbelow, State Auto's claims and causes of action cannot be sustained and Summary Judgment should be entered in favor of Hubar as to all causes of action alleged. Alternatively, Hubar requests the Court grant partial summary judgment on all counts that the Court finds the evidence shows should be granted.

## II.    FACTUAL SUMMARY

At the time of the loss that is the subject of this litigation, Hubar's principals and members were William Hudspeth ("Hudspeth") and Kevin Barrows ("Barrows").  (Ex. A, p. 2-3; Ex. C, p. 9-10; Ex. G, p. 7; Ex. H., p. 61).     Hudspeth is also the CEO of First National Bank of North Arkansas, (see Ex. C, p. 7; Ex. D., p. 32), and Barrows owns, among other companies, Barrows Excavation, (see Ex. E, p. 2; Ex. G, p. 6). Hubar is a real estate investment company owned by Hudspeth and Barrows. (Ex. C, p. 10; Ex. G, p. 7).

CARDS was established in 2017 and by May 2018 was owned by Hudspeth, Barrow, and Dan Christensen ("Christensen"). (Ex. R; Ex. S). Prior to March 2019, among other business ventures they had, Hudspeth and Barrows had been in business with Christensen in Illinois and owned a company called DC Trash, which was a trash and garbage business. (Ex. D, p. 12-13; Ex. I, p. 2-3; Ex. J, p. 1; Ex. K, p. 23-24).

In 2019, Christensen ran the day-to-day operations of CARDS. (Ex. C, p. 11, 14-15, 17-19; Ex. G, p. 9-11; Ex. I, p. 2-3). CARDS also had a subsidiary company called Trashmann, which had the same or similar type of operation as CARDS. (Ex. A, p. 3-4; Ex. C, p. 21-22; Ex. G, p. 15-16; Ex I, p. 6; Ex. K, p. 67). Hubar was looking for an investment to have rental income and Christensen, through CARDS, was looking to get into northwest Arkansas to operate. (Ex. A, p. 6-7). In this regard, Christensen set out to find property that Hubar could purchase for investment purposes and for which CARDS could operate. Christensen located property at 14144 Springtown

3

Road, Gentry, Arkansas ("Insured Property"), the property which is the subject of this litigation, and brought it to Hubar's attention to purchase. (Ex. A, p. 6-7; Ex. D., p. 13-14; Ex. K, p. 67-68).

Hubar purchased the Insured Property specifically to lease to CARDS to build and operate a waste transfer station, and also for storage and maintenance of trucks and equipment. (Ex. A, 6-7; Ex. C, p. 13-14; Ex. D, p. 12-13; Ex. I, p. 3-4; Ex. K, p. 62, 67-68). In the first few months of 2019, Hudspeth, Barrows and Christensen discussed the lease arrangement Hubar and CARDS would have for this property and CARDS's operations. By March 2019, the two companies had entered into a verbal lease agreement whereby CARDS would lease the Insured Property from Hubar for ten thousand dollars ($10,000.00) a month. (Ex. A, p. 6-9; Ex. C, p. 34-35, 39-40, 43-44, 50, 52; Ex. E, p. 5; Ex. G, p. 20, 22, 24-27; Ex. I, p. 4, 9, 11, 12-14; Ex. K, p. 24-26, 35, 58).

Because CARDS was just beginning and lacked cash flow, Hudspeth, Barrows, and Christensen verbally agreed that the rents would start accruing on March 1, 2019—the first full month CARDS took possession of the property and started using the premises—but Hubar would not require payment to be made until CARDS was "on its feet," "up and running," and was "cashflowing." At that time, CARDS would pay the rents accrued to Hubar and then start paying monthly rent. This verbal agreement was not memorialized in a written agreement until State Auto informed Hubar it needed to be after the tornado loss which is the subject of this litigation. (Ex. A, 8, 10-11, 13; Ex. C, 35-36, 49-50; Ex. D, p. 35-36; Ex. E, p. 4-6; Ex. G, p. 24-27, 30; Ex. I, p. 4, 13-14; Ex. K, p. 24-26, 40).

Upon purchasing the Insured Property, Hubar contacted its insurance agent, Wes Newland ("Newland") to secure insurance coverage. Newland, an independent insurance agent since 2005, has a longstanding professional relationship with Hudspeth and Barrows and has written insurance for their different companies and entities on multiple properties, rental units, storage units, car

washes, and other business ventures. (Ex. L, p., 30-31). Hudspeth and Barrows informed Newland that the Insured Property was a commercial property they were going to lease to another entity. (Ex. L, p. 33-34). Newland advised State Auto when they were pricing the property that it was going to be a rental property and that they would be leasing it. (Ex. L, p. 33-34, 54-56; see exhibit 11 &12 to Ex. L).

State Auto then issued a Preferred Business Policy No. PBP 2860734 00 ("Policy") to Hubar insuring the Insured Property with a policy period of February 28, 2019, through February 28, 2020. (*See* State Auto Amended Complaint, Ex. A, p. 1-135; Ex. T). The Policy provided the following coverages and policy limits: $1,000,000.00 for building coverage, $100,000.00 for Debris Removal, $75,000.00 for Business Income Loss and Extra Expense, and $50,000.00 limit for Outdoor Property damage. (*See* State Auto Amended Complaint, ¶ 6; Ex. T).

On October 21, 2019, a tornado damaged the Insured Property and Hubar promptly reported the loss, making a claim for the aforementioned coverages. State Auto admits that the covered peril, the tornado, seriously damaged the property and was a covered loss. (Ex. M, p. 8-10). They admit that the building was damaged in excess of the $1,000,000.00 policy limit and paid that coverage. (Ex. M, p. 10; State Auto Amended Complaint, ¶ 20). They further agree that Hubar made a claim for the policy limits on the Debris Removal of $100,000.00 and the Outdoor Property of $50,000.00 and they agreed that that the loss exceeded those limits as well. (Ex. M, p. 9-11).

The State Auto adjuster assigned this loss, Julie Ross ("Ross"), met shortly after the tornado at the Insured Property location with Barrows, Newland, Christensen, and two construction and/or engineering experts State Auto hired to assess the damage. (Ex. M, p. 18-22). After the State Auto experts assessed the damage, and discussed the damage at the scene with

Ross, State Auto and their experts made a determination that the loss was in excess of the policy limits. (Ex. M, p. 22-23; Ex. Q). They specifically discussed that Debris Removal would exceed the policy limits of $100,000.00 and that the Outdoor Property damage would exceed the policy limits of $50,000.00. (Ex. M, 22-23). However, while they paid the limits of $1,000,000.00 on the building claim, they have refused to pay on the debris removal and outdoor property claims even though they admit the claims are in excess of those limits.

In Ross's initial phone conversation with Hudspeth immediately following this loss, State Auto admits (1) they discussed the BIL claim and Hudspeth specifically told Ross that Hubar had an agreement to lease the property to CARDS but that nothing was in writing; (2) Ross discussed with Hudspeth the monthly rental amount on the verbal lease; and (3) Ross was told that there was no written lease, it was all verbal, and no payments had been made at that time. (*See* Ex. M, p. 25-28). Hudspeth specifically told Ross in that conversation that Hubar and CARDS did not have a written agreement, it was a gentleman's agreement, and that no rental payments had been made as of October 2019 following the tornado loss and that their intent was to let CARDS get on its feet and let rent accrue before Hubar began collecting. (Ex. A, p. 8, 11-12; Ex. C, p. 30-32, Ex. M, p. 25-28).

During the claims process, Hudspeth notified Newland they wanted to make a BIL claim for the lost rents since the property was not usable after the tornado. Newland notified Ross on November 25, 2019, that Hubar wanted to make a BIL claim and advised State Auto there was a rental agreement and it was accruing on a monthly basis until CARDS was able to pay. (Ex. M, exhibit 1 thereto, p. 10; Ex. L, exhibit 1 thereto). Ross responded that Hudspeth had told her there was no <u>written</u> agreement, no money had been paid, and that she would need both of those, specifically a lease, to consider the BIL claim. (Ex. M, p. 28 and exhibit 1 thereto, p. 10; Ex. L,

exhibit 1 thereto). Notably, the Policy does not require a written agreement in order for coverage to apply—either an oral or written agreement is sufficient—and State Auto admits a written agreement is not required. (Ex. T, p. 60-61/135; Ex. M, p. 34-35, 75-76).

Newland then spoke with Hudspeth, Barrows, and Christensen and told them that the lease agreement must be in writing in order for the BIL to be covered. (Ex. L, p. 14-15, 48-49). Again, this was admittedly not true. (*See* Ex. T, p. 60-61/135; Ex. M, p. 34-35, 75-76). Following this, Hubar and CARDS memorialized their oral agreement into a written agreement titled a Property Use Agreement ("PUA"). (Ex. A, p. 10; Ex. B, p. 1-3; Ex. C, p. 40; Ex. D, p. 25; Ex. E, p. 6; Ex. F, p.1-2; Ex. G, p.21-22, 36-37; Ex. I, p. 11-13; Ex. K, p. 22-24, 33-35, 72). Hudspeth then sent the PUA via email to Newland on December 2, 2019, stating the lease agreement between Hubar and Trashmann, a subsidiary of CARDS, was attached. (Ex. L, exhibit 2 attached thereto). When Newland received it, he forwarded it to State Auto. (Ex. L, p. 28, exhibit 19 to Ex. L; Ex. M, p. 44-46, exhibit 2 attached thereto).

When State Auto received the email with the PUA, without further discussion with anyone as to the origin of the lease, on December 4, 2019, Ross turned the matter over to State Auto's Special Investigative Unit ("SIU"). (Ex. M, p. 49-51, exhibit 1, p. 20, attached thereto). An investigation as to the origin of the lease agreement was then started by the SIU adjuster.

On January 13, 2020, Hudspeth sent the SIU adjuster an email confirming that he had always told Ross that Hubar and CARDS had a verbal agreement and that they understood from their conversation with Newland that State Auto needed it in writing to process the BIL claim, so they had Christensen commit to writing what they had agreed to verbally months prior. (Ex. M, p. 54-55, see ex. 1, p. 30, attached thereto).

On February 11, 2020, Hudspeth, Barrows, and Christensen voluntarily gave recorded statements to the SIU adjuster. (Ex. A, B, E, F, I, and J). Each one of them told the SIU adjuster that they never had a written agreement prior to the tornado, rather, it was a verbal, gentleman's agreement. (Ex. A, B, E, F, I, and J). They further stated that they had Christensen memorialize in writing their prior verbal agreement to reflect what they had agreed to and he put it into the PUA. They stated they did that because they were advised, or were under the impression, that State Auto would not be able to consider their BIL claim without something in writing confirming what they had agreed to verbally. (Ex. A, B, E, F, I, and J).

On August 10, 2020, Hudspeth and Barrows agreed to sit down for an Examination Under Oath ("EUO") by State Auto's attorney. In those EUOs, they both again confirmed that they had a verbal agreement that was later memorialized in writing after the tornado because they understood State Auto needed a writing to consider their BIL claim. (Ex. C, p. 30-32, 36-40, 46-47; Ex. G, p. 20-22, 35-37). On December 7, 2021, Hudspeth and Barrows again sat down with State Auto's attorney for a deposition and again confirmed the existence of the oral lease agreement that was committed to writing and evidenced in the PUA. (Ex. D, p. 23-27; Ex. H, p. 64-66). On December 21, 2021, Christensen affirmed this in his deposition. (Ex. K, p. 18-19, 21-25, 33-35, 40, 72-74, 77).

Prior to the tornado, there had been discussions between Hudspeth, Barrows, and Christensen of Christensen buying them out of their interest in CARDS. On November 12, 2019, they entered into a Purchase Agreement wherein Christensen would buy out Hudspeth and Barrows. (Ex. O). However, under the terms of the agreement, the sale was not complete on November 12, 2019, and in order for the total buy out to go through, there were contingent obligations Christensen had to fulfill. These included being able to remove Hudspeth and Barrows

from all of their guarantees on numerous loans and notes. If these contingencies were not met, then the buyout of Hudspeth and Barrows would be null and void. These contingencies were not met/removed until approximately the summer of 2020 and the three gentlemen were able to finalize the buyout then. (Ex. O; Ex. C, p. 10-12, 15-16, 57-58; Ex D, p. 18-19, 28-29, 32-33, 35-37; Ex. G, p. 9, 11-13; Ex. H, 34, 63-67; Ex. K, p. 28-30, 74-77). In addition, although the PUA and written lease agreement did not address the rent accruing between March 2019 and October 2019 from CARDS to Hubar, the three gentlemen agreed in the spring or summer of 2020 that this rent would be waived in exchange for Christensen providing Hudspeth and Barrows a trommel screen. Thus, by the late summer/early fall of 2020, CARDS no longer owed the rent that accrued between March 2019 and October 2019. (Statement of Undisputed Facts, ¶ 32). This was represented to State Auto thereafter in August 2020 and December 2021. (Statement of Undisputed Facts, ¶¶ 33-36).

It is from these events that State Auto now seeks to deny coverage to Hubar while simultaneously requesting reimbursement of payments already made.

## III.   STANDARD OF REVIEW

This Court is well aware of the standard of review for Motions for Summary Judgment. The United States District Court for the Western District of Arkansas has stated the standard as follows:

> Summary judgment is appropriate where it is 'shown that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' When a motion for summary judgment is made and supported as provided in (Rule 56), an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in (Rule 56), must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
>
> The United States Supreme Court has articulated guidelines for application of Rule 56, state that 'the plain language of Rule 56C mandates an entry of summary judgment after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.' In such a situation, 'there could be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.'

Therefore, once a motion for summary judgment reveals the non-movant's complete failure of proof regarding an essential element of their case, the burden shifts to the non-movant to offer 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture or fantasy.' The 'mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law.' If the non-movant fails to demonstrate the existence of a genuine issue of material fact by offering significant probative evidence, the defendant is entitled to summary judgment as a matter of law.

*Midland Risk Ins. Co. v. White,* 959 F. Supp. 1092, 1098 (W.D. Ark. 1997) (internal citations omitted). This Court has jurisdiction over the current lawsuit pursuant to diversity of citizenship. As such, the substantive law of the State of Arkansas will apply. *Erie R.R. Co. v Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## IV.    ARGUMENT

Even taking State Auto's allegations as true, State Auto's claims must fail. For context, the Policy allows State Auto to void coverage if Hubar commits fraud or makes a misrepresentation of material fact (more or less fraud) during the claims process, (see Ex. T, p. 30/135), which State Auto alleges Hubar did. Thus, State Auto first seeks a Declaratory Judgment finding that there is no coverage because (1) Hubar's oral agreement with CARDS is void because it violates the statute of frauds (Ark. Code Ann. §4-59-101); and (2) Hubar committed fraud and made misrepresentations of material fact during the claims process. State Auto's second cause of action is for breach of contract based on the same alleged conduct as the declaratory judgment action, as well as Hubar failing to provide documentation of its loss(es) to State Auto. For the reasons stated

below, State Auto cannot establish fraud or a misrepresentation of material fact, or breach of contract, as a matter of law, and therefore Summary Judgment in favor of Hubar should be granted.

### A. Declaratory Judgment

In order to be entitled to a declaratory judgment finding that there is no coverage, State Auto must establish that Hubar committed fraud or made a misrepresentation of material fact (more or less fraud) during the claims process. (*See* Ex. T, p. 30/135). To support its request for Declaratory Judgment, State Auto relies on two primary allegations to establish Hubar's fraud/misrepresentation of material fact. First, that Hubar and CARDS's lease agreement was required to be in writing (based on the statute of frauds), thus making the existence of a <u>written</u> agreement a material issue, and Hubar made a misrepresentation as to when the writing came into existence, therefore voiding coverage. Second, and somewhat related to the first allegation, that Hubar intentionally misrepresented that there was a <u>written</u> lease agreement prior to the tornado loss. As set forth herein, State Auto's argument must fail because <u>whether there was a written</u> <u>agreement, and when that agreement came into existence, is not material</u>. Rather, <u>what is material</u> <u>is whether an agreement existed at all, and the undisputed facts establish Hubar and CARDS did</u> <u>have such an (oral) agreement at all pertinent times</u>. Because Hubar's alleged misrepresentations pertain to whether and when a <u>written</u> agreement came into existence, rather than if an agreement (including oral) existed at all—which one indisputably did—<u>these misrepresentations were not of</u> <u>a material fact</u>. As such, Hubar is entitled to summary judgment on State Auto's request for declaratory judgment.

> 1. <u>Hubar's oral agreement with CARDS/Trashmann is not void because of the</u>
>    <u>statute of frauds (Ark. Code Ann. § 4-59-101).</u>

Simply, State Auto cannot rely on the statute of frauds (Ark. Code Ann. § 4-59-101) to argue a lease agreement did not exist. *See Farm Bureau Mut. Ins. Co. v. Hardage,* 266 Ark. 767,

587 S.W.2d 836 (Ark. App. 1979) (a stranger to an agreement cannot rely on the statute of frauds to argue the agreement did not exist). Notably, in *Hardage,* the insurance company attempted to argue what State Auto argues now in an attempt to void coverage wherein there was an oral agreement between a buyer and seller as to terms of the sale of real property. *See id.* The Court, in rejecting the insurance company's reliance on the statute of frauds, stated:

> The appellant, Farm Bureau Mutual Insurance Company of America, was not a party to the written or oral contract. *Russell v. Keene,* 239 Ark. 752, 394 S.W.2d 131 (1965) held that **a third party insurance company who was not a party to the contract may not raise the defense of the statute of frauds**. This legal principle is restated in 73 Am. Jur. 2d 582 and also in 37 C.J.S. §220(e).

*Hardage,* 266 Ark. at 769 (emph. added). Since State Auto is not a party to the lease agreement, it cannot rely on the statute of frauds to argue it is invalid or otherwise did not exist.

Further, even if State Auto could rely on the statute of frauds, its argument would nonetheless fail. A party may establish by clear and convincing evidence that an agreement otherwise required to be in writing nonetheless exists as an oral contract so to overcome the statute of frauds. One way to do this is if both parties agreed that a contract was made. *See White v. White,* 254 Ark. 257, 493 S.W.2d 133 (1973); *Pfeifer v. Raper,* 253 Ark. 438, 486 S.W.2d 524 (1972). Here, both Hubar and CARDS admit that an oral lease agreement existed at all relevant times. (Statement of Undisputed Facts, ¶¶ 5-6). As such, the evidence clearly overcomes the statute of frauds "requirement."

As established herein, State Auto cannot rely on the statute of frauds to argue that there is no coverage due to a lack of a written agreement. This is important because, if the statute of frauds is inapplicable, then it is immaterial whether Hubar and CARDS's lease agreement was in writing or when the writing came into existence. As such, any misrepresentation by Hubar as to when the written agreement came into existence is immaterial (again, what is material is whether any

agreement—oral or written—existed at all pertinent times). As such, because the statute of frauds is inapplicable, State Auto cannot rely on it to argue Hubar made a misrepresentation of material fact so to void coverage.

### 2. State Auto cannot prove fraud or a misrepresentation of material fact

To be entitled to a declaratory judgment, State Auto must prove Hubar committed fraud or made a misrepresentation of material fact (which is the first element of fraud). (*See* Ex. T, p. 30). In order to establish fraud, State Auto must prove (1) Hubar made a false representation of a **material fact**; (2) Hubar knew or believed that the representation was false; (3) Hubar intended to induce State Auto to act in reliance on the misrepresentation; (4) State Auto justifiably relied on the misrepresentation and (5) as a result, State Auto sustained damages. See Arkansas Model Jury Instruction 402; *Gallion v. Cole,* 2000 Ark. App LEXIS 709; *Baskin v. Collins*, 305 Ark. 137, 806 S.W.2d 3 (1991). State Auto has the burden of proving each and every one of these elements by clear, strong and satisfactory proof. *Arkansas State Hwy Com. v. Clemmons,* 244 Ark. 1124, 1126, 428 S.W.2d 280 (1968). Although State Auto cannot establish any of the essential elements of fraud, its request for declaratory relief fails as a matter of law based on the first element—i.e., State Auto cannot prove that Hubar made a misrepresentation of material fact (which is also conclusive of the second basis for voiding coverage).

State Auto contends that Hubar knowingly made misrepresentations of material fact during the claims process in that Hubar provided State Auto the PUA that was backdated to the date that the oral lease agreement was entered. In other words, State Auto contends that by misrepresenting when the PUA was put down in writing, Hubar made a misrepresentation of material fact so that State Auto may void coverage. Importantly, State Auto cannot dispute that an oral agreement existed at all relevant times, and this fact alone entitles Hubar to summary judgment.

13

As set forth above, the statute of frauds is inapplicable, and thus the existence of a written agreement is legally immaterial. As such, State Auto cannot rely on statute or common law to argue Hubar's misrepresentation as to when the written agreement was executed pertained to a material fact.

In addition, the Policy did not require the lease agreement to be in writing. (*See* Ex. T, p. 60-61/135); (Ex. M, p. 34-35, 75-76) (State Auto admits that the Policy does not require the lease agreement to be in writing). The Policy only required that an agreement—whether oral or written—be in existence. Here, the undisputed facts establish that such an agreement existed. (Statement of Undisputed Facts, ¶¶ 5-6). As such, Hubar's alleged misrepresentation as to when the agreement was put in writing is immaterial—the only material fact is whether the agreement existed at all (which it did). Because Hubar did not misrepresent the existence of an agreement (according to State Auto, Hubar only misrepresented when the agreement was put into writing – which is not material), State Auto's request for declaratory relief must fail.

Based upon the foregoing, because State Auto cannot establish that Hubar misrepresented a material fact (and thus cannot establish fraud), its claim for declaratory judgment fails as a matter of law. As such, Hubar is entitled to Summary Judgment on this claim.

### B.    Breach of Contract

State Auto contends that Hubar breached the insurance contract and therefore, not only does State Auto not owe Hubar anything more on its claim, but State Auto is also entitled to reimbursement of the money it already paid Hubar. For the reasons set forth herein, State Auto cannot, as a matter of law, prevail on its claim for breach of contract.

First, a large part of State Auto's breach of contract claim is dependent on the same allegations as its request for declaratory judgment. As set forth above, any reliance on Hubar's

14

fraud or other misrepresentation of material fact fails, and Hubar is entitled to, at the very least, partial summary judgment on this portion of State Auto's breach of contract claim.

The only other allegation in State Auto's breach of contract claim is that Hubar has not provided them documentation reflecting expenses Hubar incurred on its claims for Outdoor Property, Business Income and Extra Expense (BIL), and Debris Removal so that State Auto can make a determination of the costs and what it owes. State Auto somehow alleges that Hubar's failure to provide documentation is a breach of contract.

As an initial matter, Hubar has provided various documentation that has been requested. (*See* Ex. P; Ex. Q). Hubar is willing to provide whatever else may be requested, but it is difficult to see how this would support a breach of contract claim. In fact, it would appear that the requirement that Hubar provide documentation is intended as a defense for State Auto (i.e., if Hubar sued State Auto for not providing coverage, State Auto could rely on this provision that Hubar had failed to provide proof/evidence of its claim). It makes little sense that an insurance carrier can use this provision as a sword, rather than a shield, and sue an insured for failing to provide documentation. If this were the case, and an insured ever made a claim for coverage, the insurance carrier could affirmatively sue the insured for breach of contract for failing to provide requested documentation, rather than use this as a basis to deny coverage. This is illogical.

Further, State Auto has already admitted that Hubar's claims for these coverages exceed their policy limits, so it makes little sense why Hubar would need to provide additional information. (Ex. M, p. 22-23). Because State Auto admits that the claim exceeds the policy limits, it would also be impossible for State Auto to establish that it has been prejudiced or damaged by Hubar's alleged failure to provide proof of its claim, or that this "breach" is in anyway material.

Finally, State Auto's actions have made performance impossible as they stopped processing the entire claim back in December 2019 when the PUA was sent. The law is clear that there can be no breach where performance is prevented by the conduct of the other party. Further, the party whose own conduct prevents performance cannot complain of misperformance. *Townes v. Oklahoma Mill Co.*, 85 Ark. 596, 109 S.W. 548, 549 (1908). *See also* AMI 2441; *Harris v. Holder,* 217 Ark. 434, 230 S.W.2d 645 (1950); *Cantrell-Waind & Associates, Inc. v. Guillaume Motorsports, Inc.,* 62 Ark. App 66, 968 S.W.2d 72 (1998). Because State Auto stopped processing the claim in December 2019, how can they now claim that Hubar is obligated to do anything further? Obviously, this makes little sense. And again, Hubar previously provided everything that it thought had been requested. (*See* Ex. P; Ex. Q).

Simply, State Auto's breach of contract claim fails as a matter of law for the same reasons its request for declaratory relief fails. In addition, State Auto cannot rely on Hubar's failure to provide documentation as a basis for a breach of contract claim, and thus its claim fails as a matter of law for this reason as well.

Based on the foregoing, Hubar is entitled to Summary Judgment on State Auto's breach of contract claim. If this Court finds that there is a question of fact as to whether Hubar's alleged failure to provide documentation constitutes a breach of contract, then Hubar is nonetheless entitled to partial summary judgment on State Auto's claim to the extent it relies on Hubar's fraud or misrepresentation of material fact.

V.     **CONCLUSION**

State Auto's request for declaratory relief must fail because State Auto cannot establish that Hubar committed fraud or otherwise made a misrepresentation of material fact. Hubar's breach of contract claim also fails for this reason, and because Hubar's failure to provide

documentation is untrue and/or otherwise does not support a breach of contract claim. As such, Hubar requests this Court grant it summary judgment on State Auto's claims and dismiss them in their entirety. In the alternative, Hubar requests this Court grant partial summary judgment on all claims based upon Hubar's fraud/misrepresentation, as the undisputed facts and law do not, as a matter of law, support such a finding.

Based upon the above, Hubar prays that this Court grant it Summary Judgment on all claims and causes of action alleged in State Auto's Amended Complaint. Alternatively, Hubar prays, in the event the Court should decide that Summary Judgment is not appropriate on all counts, grant partial Summary Judgment on the claims or causes of actions for which the Court finds Summary Judgment is appropriate. Further, that Hubar recover attorneys' fees, costs, penalties and any other damages for which they are entitled under the law.

Respectfully Submitted,
HUBAR, INC., Defendant/CounterPlaintiff

BY:      _/s/  Timothy J. Myers_
TIMOTHY J. MYERS #93110
TAYLOR LAW PARTNERS, LLP
P.O. BOX 8310
FAYETTEVILLE, AR  72703 (479) 443-5222
tmyers@taylorlawpartners.com

## CERTIFICATE OF SERVICE

I, Timothy J. Myers, attorney herein, hereby certify that on the 9th day of February, 2022, I electronically filed the foregoing with the Clerk of the Court using the Electronic Filing System, which shall send notification of such filing to the following counsel of record:

Hon. Scott McCullough
McNabb, Bragorgos, Burgess & Sorin, PLLC
81 Monroe Ave., 5th floor
Memphis, TN 38103-5402

_/s/  Timothy J. Myers_
TIMOTHY J. MYERS